**EXHIBIT B**

```
- - - - - - - - - - - - - - - - - - - - - X
```
In the Matter of the Arbitration between

MICHAEL FISHMAN, PRESIDENT, LOCAL 32BJ,
SERVICE EMPLOYEES INTERNATIONAL UNION

**OPINION AND AWARD**
Case #22462

- and -

SEA PARK EAST COMPANY
C/O PHIPPS HOUSES SERVICES, INC.

- and -

REALTY ADVISORY BOARD ON LABOR RELATIONS, INC.
```
- - - - - - - - - - - - - - - - - - - - - X
```

**APPEARANCES:**

| | |
|---|---|
| For the Union: | Jessica Faige, Esq.<br>Associate General Counsel |
| | Tommie Lawson, Business Agent |
| For the Employer: | Kevin McGill, Esq.<br>Miriam Rubinton<br>Rick Purdy<br>Alan Anker |
| For the Realty<br>Advisory Board: | Michael Rivituso, Esq. |
| Employee: | Everton Clemmings |
| Premises: | 2727 Surf Avenue, 2828 West 28th Street<br>2930 West 30th Street |

A dispute having arisen between SEA PARK EAST COMPANY C/O PHIPPS HOUSES SERVICES, INC. and the Realty Advisory Board, Inc. (hereinafter referred to as the "Employer") and Local 32BJ, Service Employees International Union (hereinafter referred to as the "Union"), concerning 2727 Surf Avenue, 2828 West 28th

1

JUN 19 2006

Street and 2930 West 30th Street ("the Premises"), the same was submitted for arbitration and Award pursuant to the pertinent provisions of the current Collective Bargaining Agreement between the parties.

In a letter to the Office of the Contract Arbitrator dated September 12, 2005 the Union alleged the following complaint and the same was by mutual consent of the parties submitted to me for adjudication and Award at hearings properly noticed for February 8, and March 31, 2006:

> The employer agreed to pay all sick days and bonus that the members were entitled to for 2004 but has failed to do so.
>
> We are claiming payment to the members of the afore-mentioned buildings all sick days, bonus owed and penalty.

Briefly stated, the collective bargaining agreement allows ten days of sick leave annually to each employee who has "continued employment to the end of the calendar year." If an employee uses less than ten sick days, the "unused" days are to be paid in cash; and any employee who has taken no sick days is to receive, in addition, a cash bonus of $200. Payments called for are to be made in the succeeding January and if not paid before the end of February, an additional day's pay is due "unless the Employer challenges the entitlement or amount due." In the parlance(and in the grievance), the additional late

payment is referred to as a "penalty" although the contract does not use that term.

Some basic facts are stipulated or not contested; others are disputed. The Employer has interposed a number of objections at least two of which would defeat the claim or deprive this arbitrator of jurisdiction. The "equities" play a major role in both the Union's claim and the Employer's defenses. We'll do our best to maximize the justice factor.

FACTS

Sea Park is located in the Coney Island section of Brooklyn and consists of three groups of buildings with a total of 872 apartments. During the period of September to October 2004, the buildings were individually purchased by the current Employer from Empire State Development Corporation ("Empire State"), a state agency that was signatory to a collective bargaining agreement with the Union. Twenty-one employees comprise the bargaining unit. The present management company, Phipps Houses Services, Inc. ("Phipps Houses"), managed the property since March 2003 during both Empire State's and the Employer's ownership.

Shortly after the Employer purchased Sea Park, it entered into a Memorandum of Agreement ("MOA") with the Union wherein it agreed to adopt the 2003 Apartment House Agreement subject to

3

modifications set forth in the MOA. The MOA did not modify any of the several sick-day provisions set forth in Article X, Section 36, nor did the parties negotiate additional sick-day provisions. The MOA also contained its own arbitration clause designating Elliott Shriftman to determine "any unresolved disputes concerning the meaning and application of this Agreement" via "expedited arbitration."

By the end of February 2005, the Sea Park employees had not received payment for unused 2004 sick days or the perfect attendance bonus where applicable. The shop steward, Everton Clemmings, brought this matter to the attention of the Union in the person of Tommie Lawson, a Business Agent. Lawson had had primary responsibility for the premises until January 2003 and while his assignment changed, he continued to get calls and handle grievances since the Union had assigned no other delegate to the premises.

So, Lawson called Phipps Houses and spoke to Catherine McAuliffe, the person in charge. McAuliffe told Lawson she'd check and call Lawson back. She didn't, so Lawson called her again. He placed this communication a "couple of months" after the first call which could not have been earlier than late February, early March. In that conversation, probably early May, McAuliffe told Lawson that members would be paid their

4

unused '04 sick days.

And in fact, sometime in the April – May 2005 period, the precise date is uncertain, the Employer paid the employees for some, but not all, of the 2004 sick days. Essentially, the Employer took a pro-rata approach to the employees' entitlements – it paid for unused sick days which had accrued form the time it took over the several properties to the end of 2004. The attendance bonus and additional pay for late payment were not part of the Employer's calculation.

On June 2, 2005, Clemmings filed a complaint with the Union on behalf of the bargaining unit members. Clemmings also provided the Union with a list of the amounts due each employee. So armed, Lawson again contacted Phipps Houses and spoke with "Angel," who worked in the payroll office, and Miriam Rubinton, who had replaced McAuliffe as the site manager. After speaking with these individuals, Lawson came away with the impression that the Employer had paid employees the amounts owed. Sometime later, Clemmings set Lawson straight – that only partial payments were made – and still later, in August, 2005, Angel told Lawson that the Employer believed that its liability had been "resolved" i.e. no further payments would be made.

On September 12, the Union sent a formal grievance notice to the Employer. Step 2 grievance hearings were scheduled for

5

October 12 and November 9, 2005.

**ARGUMENTS**

The Employer has interposed four defenses, any one of which would defeat the claim. They are:

1. The grievance is time-barred having been filed more than 120 days of its occurrence.

2. Neither OCA nor the Undersigned has jurisdiction since the parties agreed to submit all disputes to Arbitrator Shriftman.

3. The Employer has been prejudiced by the Union's adamant refusal to join Empire State as a respondent.

4. On the merits, there is a total failure of proof of entitlement to payment.

I'll start with argument #2 - the claim that this matter can only be heard by Arbitrator Shriftman.

There are several reasons why I cannot buy this argument. Union's Counsel suggests a textural one: the MOA distinguishes between the MOA and the 2003 Apartment House Agreement, using the term "this Agreement" to refer to the former, and "Apartment House Agreement" to refer to the latter.

Additionally, in my experience, it would be highly unusual for a union to allow an employer buying into an established industry agreement, to negotiate out of an industry-wide

6

arbitration panel. Equally, in my experience, it would be highly unusual for an employer to specify that all arbitrations be on an expedited basis.

In other words, text, logic and experience lead to the conclusion that this claim of entitlement to sick leave benefits – a claim that arises under the Apartment House Agreement, not the MOA – should be heard by an arbitrator appointed pursuant to the Apartment House Agreement.

Argument #3, the claim for joinder of the prior owner, has some emotional appeal but no legal bite. No authority has been cited for the proposition that ESDC is a "necessary party." While it may be that it would have been "easy" for the Union to join ESDC, even advantageous for it to do so, and "arrogant" for it not to, I cannot conclude that the Employer has been denied fundament fairness by the Union's refusal. Moreover, are not positions, such as advanced here by the Employer, of the type that might be addressed in a real-property closing?

Argument #1, that the grievance is time-barred, presents a serious issue. Clearly, the grievance was not presented to the Employer in writing "within 120 days of its occurrence" as required by the Apartment House Agreement. The Agreement states that sick benefits of the type claimed here "shall be paid in the succeeding January." Therefore, the basic claim arose on

February 1 and to be timely the grievance should have been "presented" no later than June 1. The Union suggests that the agreement gives the employer a 28-day "grace period" for the payment of benefits so that its claim did not arise until March 1. On that basis, which I'll accept for argument purposes, the grievance should have been "presented" by the end of June. In fact, the grievance is dated September 12.

On the 120-day standard the grievance is untimely. The agreement, however, gives an arbitrator authority to extend the time limit "for good cause shown." The Union's argument here is essentially that the parties were in discussion on the issue such that "the Union believed that the Employer was going to pay all of the sick days," ergo the filing of a grievance was both unnecessary and potentially injurious to a developing relationship. While there is much truth in that formulation, it is the kind of truth that arbitrators in this office tend to discount. Moreover, the Union had strong reason to believe in May that the Employer had no intention of paying more that a pro-rata portion of its claim, and there would still have been time to file.

Shifting gears, the Union also argues that the Employer waived its time-barred argument by not raising it in a timely manner, citing cases for that proposition.

8

Liking waiver arguments about as much as forfeitures, I will exercise my "good cause" authority in favor of the Union and will allow the grievance to go forward. There is no prejudice here in the sense that a stale claim is being heard. The Employer knew it was paying only a part of the claim and I can't but believe that it was prepared for the consequences. Moreover, the Employer didn't clearly express its position until August when the 120 days had run. I will deal with other fairness aspects below.

Argument #4 deals with the merits. In simplest formulation the argument is that the claim is based on Clemmings' incorporation of the information gathered by three section heads and as a matter of proof, is both flawed and insufficient. While the Employer had the opportunity at the hearing to present its "better" evidence, it chose not to do so and one is inclined to decide the case on what is now before the court.

But given the competing claims of fairness, I will allow the Employer its day on the ultimate dollar issue as set forth below.

### AWARD

The grievance is sustained to the extent set forth. Within thirty (30) days of the date hereof, the Employer will present

in writing to the Union, its objections to the claim sheet identified as Union Exhibit 1, with payroll/attendance records and/or affidavits to support such objections. The parties will meet within twenty (20) days to try and resolve any differences; and any unresolved issues may be presented to the Undersigned who retains jurisdiction. Any claims not objected to in the original thirty-day period will be paid within ten (10) days of the end thereof. The additional day's pay for late payment shall be paid to the eleven-odd employees to whom a partial payment was made in 2005 within ten (10) days of the date hereof, and to the remaining members of the unit to whom a payment will be made in accordance with the above procedure at the time of such payment.

DATE: June 14, 2006

                                                                  _____
                                                                  NOEL B. BERMAN
                                                                  Contract Arbitrator

STATE OF NEW YORK:
                               SS:
COUNTY OF NEW YORK:

I hereby affirm pursuant to CPLR Sec. 7507 that I am the individual described in and who executed this instrument which is my Award.

DATE:   June 14, 2006

_____
NOEL B. BERMAN
Contract Arbitrator

NBB:dec

11